**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

NATHAN NAPOLEON
HIGHTOWER, III,

        Petitioner,

v.                                                            Case No. 3:17-cv-968-J-32JRK

SECRETARY, FLORIDA
DEPARTMENT OF CORRECTIONS,
et al.,

        Respondents.

_____

## ORDER

### I.    Status

Petitioner, an inmate of the Florida penal system, initiated this case with the help of counsel by filing a Petition for Writ of Habeas Corpus Under 28 U.S.C. § 2254, Doc. 1, and a Memorandum of Law, Doc. 2. He is challenging a state court (Duval County, Florida) judgment of conviction for burglary of a dwelling. He is currently serving a twenty-two-year term of incarceration as a habitual felony offender, with a fifteen-year minimum mandatory as a prison releasee reoffender. Doc. 1. Respondents have responded. See Doc. 17;

Response.[1] Petitioner filed a Reply. <u>See</u> Doc. 18. This case is ripe for review.

## II.   <u>Governing Legal Principles</u>

### A. Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs a state prisoner's federal habeas corpus petition. <u>See</u> <u>Ledford v. Warden, Ga. Diagnostic & Classification Prison</u>, 818 F.3d 600, 642 (11th Cir. 2016), <u>cert.</u> <u>denied</u>, 137 S. Ct. 1432 (2017). "'The purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction.'" <u>Id.</u> (quoting <u>Greene v. Fisher</u>, 565 U.S. 34, 38 (2011)).

The first task of the federal habeas court is to identify the last state court decision, if any, that adjudicated the petitioner's claims on the merits. <u>See</u> <u>Marshall v. Sec'y Fla. Dep't of Corr.</u>, 828 F.3d 1277, 1285 (11th Cir. 2016). The state court need not issue an opinion explaining its rationale in order for the state court's decision to qualify as an adjudication on the merits. <u>See</u> <u>Harrington v. Richter</u>, 562 U.S. 86, 100 (2011). Where the state court's adjudication on the merits is unaccompanied by an explanation,

> the federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the

---

[1] Attached to the Response are numerous exhibits. <u>See</u> Doc. 17-1 through Doc. 17-6. The Court cites to the exhibits as "Resp. Ex."

> same reasoning. But the State may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed.

<u>Wilson v. Sellers</u>, 138 S. Ct. 1188, 1192 (2018).

When a state court has adjudicated a petitioner's claims on the merits, a federal court cannot grant habeas relief unless the state court's adjudication of the claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(1), (2). A state court's factual findings are "presumed to be correct" unless rebutted "by clear and convincing evidence." <u>Id.</u> § 2254(e)(1).

> AEDPA "imposes a highly deferential standard for evaluating state court rulings" and "demands that state-court decisions be given the benefit of the doubt." <u>Renico v. Lett</u>, 559 U.S. 766, 773 (2010) (internal quotation marks omitted). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." <u>Harrington v. Richter</u>, 562 U.S. 86, 101 (2011) (internal quotation marks omitted). "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." <u>Id.</u> [at 102] (citing <u>Lockyer v. Andrade</u>, 538 U.S. 63, 75 (2003)). The Supreme Court has repeatedly instructed lower federal courts that an

> unreasonable application of law requires more than mere error or even clear error. See, e.g., Mitchell v. Esparza, 540 U.S. 12, 18 (2003); Lockyer, 538 U.S. at 75 ("The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."); Williams v. Taylor, 529 U.S. 362, 410 (2000) ("[A]n unreasonable application of federal law is different from an incorrect application of federal law.").

Bishop v. Warden, GDCP, 726 F.3d 1243, 1253-54 (11th Cir. 2013) (internal citations modified).

### B. Exhaustion and Procedural Default

There are prerequisites to federal habeas review. Before bringing a § 2254 habeas action in federal court, a petitioner must exhaust all state court remedies that are available for challenging his state conviction. See 28 U.S.C. § 2254(b)(1)(A). To exhaust state remedies, the petitioner must "fairly present[]" every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review. Castille v. Peoples, 489 U.S. 346, 351 (1989) (emphasis omitted). Thus, to properly exhaust a claim, "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999); see also Pope v. Rich, 358 F.3d 852, 854 (11th Cir. 2004) (noting "that Boerckel applies to the state collateral review process as well as the direct appeal process.").

In addressing exhaustion, the United States Supreme Court explained:

> Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b)(1), thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights.'" Duncan v. Henry, 513 U.S. 364, 365, 115 S. Ct. 887, 130 L.Ed.2d 865 (1995) (per curiam) (quoting Picard v. Connor, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L.Ed.2d 438 (1971)). To provide the State with the necessary "opportunity," the prisoner must "fairly present" his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim. Duncan, supra, at 365-366, 115 S. Ct. 887; O'Sullivan v. Boerckel, 526 U.S. 838, 845, 119 S. Ct. 1728, 144 L.Ed.2d 1 (1999).

Baldwin v. Reese, 541 U.S. 27, 29 (2004).

A state prisoner's failure to properly exhaust available state remedies results in a procedural default which raises a potential bar to federal habeas review. The United States Supreme Court has explained the doctrine of procedural default as follows:

> Federal habeas courts reviewing the constitutionality of a state prisoner's conviction and sentence are guided by rules designed to ensure that state-court judgments are accorded the finality and respect necessary to preserve the integrity of legal proceedings within our system of federalism. These rules include the doctrine of procedural default, under which a federal court will not review the merits of claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule. See, e.g., Coleman,[2] supra, at 747–

---

[2] Coleman v. Thompson, 501 U.S. 722 (1991).

> 748, 111 S. Ct. 2546; <u>Sykes</u>,[3] <u>supra</u>, at 84–85, 97 S. Ct. 2497.  A state court's invocation of a procedural rule to deny a prisoner's claims precludes federal review of the claims if, among other requisites, the state procedural rule is a nonfederal ground adequate to support the judgment and the rule is firmly established and consistently followed. <u>See</u>, <u>e.g.</u>, <u>Walker v. Martin</u>, 562 U.S. --, --, 131 S. Ct. 1120, 1127–1128, 179 L.Ed.2d 62 (2011); <u>Beard v. Kindler</u>, 558 U.S. --, --, 130 S. Ct. 612, 617–618, 175 L.Ed.2d 417 (2009). The doctrine barring procedurally defaulted claims from being heard is not without exceptions. A prisoner may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law. <u>See</u> <u>Coleman</u>, 501 U.S., at 750, 111 S. Ct. 2546.

<u>Martinez v. Ryan</u>, 566 U.S. 1, 9-10 (2012). Thus, procedural defaults may be excused under certain circumstances. Notwithstanding that a claim has been procedurally defaulted, a federal court may still consider the claim if a state habeas petitioner can show either (1) cause for and actual prejudice from the default; or (2) a fundamental miscarriage of justice. <u>Ward v. Hall</u>, 592 F.3d 1144, 1157 (11th Cir. 2010). In order for a petitioner to establish cause and prejudice,

> the procedural default "must result from some objective factor external to the defense that prevented [him] from raising the claim and which cannot be fairly attributable to his own conduct." <u>McCoy v. Newsome</u>, 953 F.2d 1252, 1258 (11th Cir. 1992) (quoting <u>Carrier</u>, 477 U.S. at 488, 106 S. Ct. 2639).[4] Under the prejudice prong, [a petitioner] must show that "the errors at trial

---

[3] <u>Wainwright v. Sykes</u>, 433 U.S. 72 (1977).

[4] <u>Murray v. Carrier</u>, 477 U.S. 478 (1986).

> actually and substantially disadvantaged his defense so that he was denied fundamental fairness." <u>Id.</u> at 1261 (quoting <u>Carrier</u>, 477 U.S. at 494, 106 S. Ct. 2639).

<u>Wright v. Hopper</u>, 169 F.3d 695, 706 (11th Cir. 1999).

In the absence of a showing of cause and prejudice, a petitioner may receive consideration on the merits of a procedurally defaulted claim if the petitioner can establish that a fundamental miscarriage of justice, the continued incarceration of one who is actually innocent, otherwise would result. The Eleventh Circuit has explained:

> [I]f a petitioner cannot show cause and prejudice, there remains yet another avenue for him to receive consideration on the merits of his procedurally defaulted claim. "[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." <u>Carrier</u>, 477 U.S. at 496, 106 S. Ct. at 2649. "This exception is exceedingly narrow in scope," however, and requires proof of actual innocence, not just legal innocence. <u>Johnson v. Alabama</u>, 256 F.3d 1156, 1171 (11th Cir. 2001).

<u>Ward</u>, 592 F.3d at 1157. "To meet this standard, a petitioner must 'show that it is more likely than not that no reasonable juror would have convicted him' of the underlying offense." <u>Johnson v. Alabama</u>, 256 F.3d 1156, 1171 (11th Cir. 2001) (quoting <u>Schlup v. Delo</u>, 513 U.S. 298, 327 (1995)). Additionally, "'[t]o be credible,' a claim of actual innocence must be based on reliable evidence not presented at trial." <u>Calderon v. Thompson</u>, 523 U.S. 538, 559 (1998) (quoting

Schlup, 513 U.S. at 324). With the rarity of such evidence, in most cases, allegations of actual innocence are ultimately summarily rejected. Schlup, 513 U.S. at 324.

### C. Ineffective Assistance of Trial Counsel

"The Sixth Amendment guarantees criminal defendants effective assistance of counsel. That right is denied when a defense counsel's performance falls below an objective standard of reasonableness and thereby prejudices the defense." Yarborough v. Gentry, 540 U.S. 1, 5 (2003) (per curiam) (citing Wiggins v. Smith, 539 U.S. 510, 521 (2003), and Strickland v. Washington, 466 U.S. 668, 687 (1984)).  To establish ineffective assistance, a person must show that: (1) counsel's performance was outside the wide range of reasonable, professional assistance; and (2) counsel's deficient performance prejudiced the challenger in that there is a reasonable probability that the outcome of the proceeding would have been different absent counsel's deficient performance.  Strickland, 466 U.S. at 687.

Notably, there is no "iron-clad rule requiring a court to tackle one prong of the Strickland test before the other." Ward v. Hall, 592 F.3d 1144, 1163 (11th Cir. 2010).  Since both prongs of the two-part Strickland test must be satisfied to show a Sixth Amendment violation, "a court need not address the performance prong if the petitioner cannot meet the prejudice prong, and vice-versa." Id. (citing Holladay v. Haley, 209 F.3d 1243, 1248 (11th Cir. 2000)). As

stated in <u>Strickland</u>: "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." 466 U.S. at 697.

"The question is not whether a federal court believes the state court's determination under the <u>Strickland</u> standard was incorrect but whether that determination was unreasonable - a substantially higher threshold." <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 123 (2009) (quotation marks omitted). If there is "any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard," then a federal court may not disturb a state-court decision denying the claim. <u>Richter</u>, 562 U.S. at 105.  As such, "[s]urmounting <u>Strickland</u>'s high bar is never an easy task." <u>Padilla v. Kentucky</u>, 559 U.S. 356, 371 (2010). "Reviewing courts apply a 'strong presumption' that counsel's representation was 'within the wide range of reasonable professional assistance.'" <u>Daniel v. Comm'r, Ala. Dep't of Corr.</u>, 822 F.3d 1248, 1262 (11th Cir. 2016) (quoting <u>Strickland</u>, 466 U.S. at 689). "When this presumption is combined with § 2254(d), the result is double deference to the state court ruling on counsel's performance." <u>Id.</u> (citing <u>Richter</u>, 562 U.S. at 105); <u>see</u> <u>also</u> <u>Evans v. Sec'y, Dep't of Corr.</u>, 703 F.3d 1316, 1333-35 (11th Cir. 2013) (en banc) (Jordan, J., concurring); <u>Rutherford v. Crosby</u>, 385 F.3d 1300, 1309 (11th Cir. 2004).

### III.  **Petitioner's Claims and Analysis**

### A. Ground One

Petitioner argues that the trial court erred in denying his motion to suppress. Doc. 1 a 5-7. According to Petitioner, trial counsel, on behalf of Petitioner, sought to suppress evidence of two state eyewitness', Curtis and Diane Goodell, pretrial identifications of Petitioner because they were obtained through impermissibly suggestive means that caused "a substantial likelihood of irreparable misidentification." Id. Petitioner asserts that the trial court violated his constitutional rights when it allowed the state to present such evidence.

Prior to trial, trial counsel filed an amended motion to suppress Mr. and Mrs. Goodell's show-up identifications of Petitioner as one of the individuals seen breaking into the victim's home. Resp. Ex. A at 144-49. The crux of Petitioner's argument was that while the police officers were still at the scene of the burglary, the officers told Mr. and Mrs. Goodell that the suspects they had described to the 911 dispatcher were in custody, suggesting that they already arrested the correct individuals. Id. at 154. Police then immediately took the Goodells to the Walmart parking lot where they had Petitioner, Leigh Pinckney, and Sharenda Freeman waiting in the back of police cruisers. Id. The police then presented Petitioner to the Goodells while he was still in handcuffs, and the Goodells identified Petitioner as one of the individuals who they saw

break into the victim's home. Petitioner sought suppression of their identifications, arguing that the means used to obtain them were unduly suggestive. In conformance with the parties' prior agreement, the trial court heard argument on the motion to suppress during trial and considered proffered testimony from Mr. and Mrs. Goodell outside the presence of the jury. Resp. Ex. E at 153-54.

Before the trial court heard this proffered testimony, Mr. Goodell testified at trial that he and the victim, Don Blanton, are direct neighbors. Id. at 238. Mr. Goodell explained that on the day of the burglary, he was working in the yard, his wife was inside, and the victim was at work. Id. at 240. He stated that he went inside to eat lunch when Mrs. Goodell noticed a man and a woman walking up the victim's driveway toward the victim's front door and a car parked near the victim's driveway. Id. at 242, 324. There was a third person in the driver's seat of the vehicle. The Goodells explained that the vehicle was a silver or gray, mid-sized sedan and they could not describe the features of the driver of the vehicle. Id. However, they did have a clear view of the man and woman who were walking toward the victim's front door.

Mr. Goodell described the male as African American, medium build, about 5'10", medium length hair, and wearing a black shirt and black pants. Id. at 245. Mr. Goodell explained that the female was also African American, about 5'5", medium build, and wearing black shorts and a black and white blouse. Id.

at 245. According to Mr. Goodell, he and his wife then heard "a boom" before his wife exclaimed that the couple was breaking into the victim's home. Id. at 245. Notably, Mrs. Goodell testified that she actually saw the male and female go inside the victim's home. Id. at 327.

Mr. Goodell immediately ran outside to document the vehicle's tag number while Mrs. Goodell called 911. Id. at 243. He testified that when the male ran out of the victim's home, he was carrying a "nine-by-five" object but Mr. Goodell admitted he could not identify the object. Id. at 246. He stated that while he was writing down the tag number, the male and female suspects running from the victim's home were about fifteen feet away from him. Id. at 247. Mr. Goodell explained that when he saw the two suspects running, nothing was obstructing his view. Id. The female got into the rear driver's-side seat of the vehicle and the male got into the front passenger-side seat. Id. at 247-48. He provided a description of the vehicle and the tag number to the 911 operator. Id. He testified that police were on scene approximately five minutes after the suspects drove away. Id.

Outside the presence of the jury, the state then proffered Mr. Goodell's identification testimony. Id. at 249-54. During the proffer, Mr. Goodell testified that two police officers arrived on scene and entered the victim's home while Mr. Goodell stood outside. Id. at 254. According to Mr. Goodell, the two officers then "in a dramatic fashion" left the scene while telling Mr. Goodell "we got a

fix on the car." Id. Mr. Goodell explained that he interpreted the officers' statement and actions to mean that they had spotted the suspect vehicle. Id. The officers then left and told Mr. Goodell to keep a watch on the victim's home, but soon returned to pick up Mr. Goodell to take him to a nearby Walmart parking lot to identify the vehicle and the individuals apprehended from the vehicle. Id. at 255. The first arrestee that police brought out was a female, she was not in handcuffs, and Mr. Goodell advised police that he did not recognize her. Id. at 256. The second individual that police presented for identification was a male (Petitioner), Mr. Goodell could not recall if he was wearing handcuffs at the time of the identification. Id. Mr. Goodell advised police that he did recognize the male; specifically, he testified that he recognized "his build, his gender, and his attire." Id. at 256-57. He explained that he was "very sure" that the male was the one he saw running from the victim's home. Id. at 257. He testified that the police then brought out a third individual. Id. He stated that it was a female and he recognized her build and her attire. Id. He explained that no one assisted him in identifying the individuals, he made the two identifications approximately 25 minutes after he saw them running from the victim's home, and he recognized the male immediately. Id. at 258.

During the proffer, the trial court inquired whether Mr. Goodell was identifying Petitioner as the male suspect because he "knew that the police had caught him in that car that [he] ha[d] identified or [if] [he] actually . . .

13

recognize[d] his build, his gender, his general" appearance as the person he saw running from the victim's home. Id. at 277. In response, Mr. Goodell stated, "I'm going to say part of each. . . ." Id. at 278. Based on that response, the trial court ruled as follows:

> THE COURT: [T]he court's ruling is going to be that this witness can tell the jurors only that he went to the show up and when the man was presented to him, that he had on similar clothing and a similar build. And what was the other? Build, gender, clothes.
>
> He can say that. But to the extent that he's now told me that he wasn't really positive identifying him, and if he hadn't known he was coming from the car. So I don't think that it would be proper to have the witness testify to the jury that he was positive it was the defendant.
>
> He doesn't identify his face. . . .
>
> So therefore - - I still think it's proper for him to say that he did go and he saw a man of familiar - - and you can lead him on this, State. Otherwise it might come out wrong.
>
> But don't tell him you're positive.

Id. at 280-81. In compliance with the trial court's limiting instruction, Mr. Goodell then testified before the jury that when he was brought to the Walmart to identify the apprehended suspects, he identified the male in custody as one of the offenders because he looked similar to the individual he saw running from the victim's home because he recognized the clothing. Id. at 293.

14

Following Mr. Goodell's trial testimony, the trial court clarified its ruling on the motion to suppress, finding that the procedure used by the police was not unduly suggestive. Id. at 309. It also noted that the witness did not make a positive facial identification, but in an abundance of caution, the trial court limited the witnesses' testimony to statements that they recognized that Petitioner's clothing and build at the time of the identification was similar to that of the male offender. Id. at 309-11. The trial court also explained that its ruling also applied to any pretrial identification by Mrs. Goodell. Id. at 311.

The state then proffered Mrs. Goodell's identification. Id. at 313. She testified that she identified Petitioner as one of the offenders because he was wearing similar clothing and had a similar build. Id. at 315. She also explained that prior to her identification of Petitioner, she did not discuss any descriptions with her husband and that she was able to identify Petitioner immediately upon seeing him. Id. at 315. Upon consideration of that proffer, the trial court again found that the police procedure was not unduly suggestive, and instead found that Mrs. Goodell's identification seemed "even more positive" than her husband's, and thus, allowed the witness to testify about similar clothing and build. Id. at 317. Pursuant to the trial court's directive, Mrs. Goodell limited her identification testimony. Id. at 332-35.

As his sole issue on direct appeal, Petitioner, with the help of appellate counsel, challenged the trial court's denial of his motion to suppress the

Goodells' identification testimony. Resp. Ex. H. In its answer brief, the state argued that the identification was not impermissibly suggestive. Resp. Ex. I. Thereafter, the First District Court of Appeal per curiam affirmed Petitioner's judgment and conviction without a written opinion. Resp. Ex. J. Presumptively an adjudication on the merits, the First DCA's decision is entitled to deference under § 2254(d).

In applying such deference, the Court notes that the Supreme Court has recognized "a due process check on the admission of eyewitness identification, applicable when the police have arranged suggestive circumstances leading the witness to identify a particular person as the perpetrator of a crime." Perry v. New Hampshire, 565 U.S. 228, 232 (2012). An out-of-court identification is subject to exclusion if the identification procedure was unduly suggestive such that it created a substantial risk of misidentification. Neil v. Biggers, 409 U.S. 188, 199 (1972). In determining whether an identification violates due process, a court undertakes a two-part analysis. "First, we must determine whether the original identification procedure was unduly suggestive . . . . If we conclude that the identification procedure was suggestive, we must then consider whether, under the totality of the circumstances, the identification was nonetheless reliable." Cikora v. Dugger, 840 F.2d 893, 895 (11th Cir. 1988) (citing Biggers, 409 U.S. at 199).

In <u>Biggers</u>, the Supreme Court identified five factors to be considered in determining whether the identification was reliable. They are: the witness's opportunity to view the suspect at the time of the crime, the witness's degree of attention, the accuracy of the description of the suspect, the level of certainty of the identification, and the length of time between the crime and the identification. <u>See</u> <u>Biggers</u>, 409 U.S. at 199. In <u>Manson v. Brathwaite</u>, 432 U.S. 98 (1977), the United States Supreme Court stated that absent "a very substantial likelihood of irreparable misidentification," the identification of a suspect by a witness is evidence for the jury to weigh. <u>Id.</u> at 116.

Under the totality of the circumstances, the Goodells' identification of Petitioner as the male offender seen breaking into the victim's home was reliable. Applying the five <u>Biggers</u> factors: (1) the Goodells viewed the offender committing the crime; (2) the Goodells' ability to describe the clothing, build, and gender supports their degree of attention; (3) while the trial court prohibited the witnesses from positively identifying Petitioner as the person they saw committing the crime, they did accurately describe the physical appearance of the male offender and the vehicle, and those descriptions matched Petitioner and the car he was apprehended from; (4) Mr. Goodell was "very sure" that the male he identified at the Walmart was the same male he saw running from the victim's home, Resp. Ex. E at 257, and Mrs. Goodell knew right away that the male she identified in the parking lot was the same man

she saw commit the offense, id. at 315; and (5) the Goodells made their identifications within an hour of the incident.

In consideration of the foregoing, the Court concludes that the state appellate court's summary adjudication of this claim was neither contrary to, nor an unreasonable application of, clearly established federal law.  Nor was the state appellate court's adjudication based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. As such, Ground One is due to be denied.

## B. Ground Two, Ground Three, and Ground Four

In Ground Two, Petitioner argues that trial counsel was ineffective for failing to adequately argue on the motion for judgment of acquittal that defense witness Leigh Pinckney's prior inconsistent statements were not substantive evidence of Petitioner's guilt, and that Pinckney's testimony "exonerated Petitioner." Doc. 1 at 8; Doc. 2 at 15. In Ground Three, Petitioner asserts that trial counsel was ineffective for failing to request a limiting jury instruction regarding Pinckney's prior inconsistent statements. Doc. 1 at 9; Doc. 2 at 16. And in Ground Four, Petitioner claims that trial counsel was ineffective for failing to object to inadmissible hearsay evidence presented by the state through Detective Thompson's rebuttal testimony regarding out-of-court statements made by Pinckney. Doc. 1 at 10; Doc. 2 at 19-22.

Petitioner raised these three issues in his motion for postconviction relief filed pursuant to Florida Rule of Criminal Procedure 3.850. Resp. Ex. K at 15-19. The trial court summarily denied the claims, addressing the issues in concert as follows:

> In Ground Five, Defendant contends that trial counsel was ineffective for failing to request a jury instruction stating "the jury could not convict the defendant based on a prior inconsistent statement." (Def.'s Mot. 15.) Defendant also claims counsel was ineffective for failing "to argue on a motion for judgment of acquittal that without the prior inconsistent [statements] of Ms. Pinckney there was not sufficient evidence for a jury to convict Defendant or to object to the improper closing argument of the State that the jury could use Ms. Pinckney's prior inconsistent statement to convict the Defendant." (Def.'s Mot. 15.) Likewise, in Ground Six, Defendant contends counsel was ineffective for failing to "make a best evidence and hearsay objection to the use of oral testimony regarding the statements of Defendant's co-defendant, Ms. Pinckney, to law enforcement" through the testimony of Detective E.M. Thompson. (Def.'s Mot. 18.) Defendant maintains the prior inconsistent identification of Defendant could only be used to impeach Ms. Pinckney's testimony, not as substantive evidence of his guilt.
>
> At trial, Defendant presented the testimony of Leigh Pinckney, who was in the car with Defendant on the day of the burglary and had already entered a plea to a burglary charge. Ms. Pinckney testified that on the day of the burglary, Defendant never got out of the car and he never went inside the victim's house. (Ex. F at 386.) Ms. Pinckney testified that she and the other female in the car with them - Sharenda Freeman - were the only ones to enter the victim's home. (Ex. F at 386.) According to Ms. Pinckney, Ms. Freeman kicked in the

door and stole the laptop. (Ex. F at 386-88.) During his direct examination, counsel asked Ms. Pinckney about her prior inconsistent statement to JSO that it was Defendant who kicked in the door and stole the laptop, while she remained in the car. Ms. Pinckney explained that she lied in her first statement to JSO to protect Ms. Freeman. (Ex. F at 390-391.) Ms. Pinckney further testified that she was under the influence of drugs and alcohol when she made the statement to JSO. (Ex. F at 391.)

In response, the State presented the rebuttal testimony of Detective E.M. Thompson. (Ex. F at 412.) Detective Thompson testified about Ms. Pinckney's prior inconsistent statements. Detective Thompson also testified that he did not believe Ms. Pinckney was under the influence of drugs or alcohol at the time she made the prior inconsistent statements. (Ex. F at 416-17.) The State offered the testimony of Detective Thompson to show that Ms. Pinckney's trial testimony was not credible. Through this testimony, the State demonstrated that Ms. Pinckney made two different statements concerning material facts, so the jury would not place great weight on her in-court testimony. Detective Thompson's testimony was not being offered for the truth of the matter asserted, and, as such, his testimony was not hearsay. See Elmer v. State, 114 So. 3d 198, 202 (Fla. 5th DCA 2012) ("[A] prior inconsistent statement admitted for impeachment purposes is not hearsay because it is not being offered for the truth of the matter asserted.").

Similarly, during closing arguments, the State focused on Ms. Pinckney's trial testimony that she was high when she gave her statement to JSO, and Detective Thompson's statement that he found her to be coherent at the time. Even if Detective Thompson's testimony about Ms. Pinckney's prior inconsistent statements was hearsay, or if the State's comments during closing arguments were improper, Defendant was not prejudiced by the testimony. The jury already

knew the details of Ms. Pinckney's prior statement, because counsel asked Ms. Pinckney to explain them during direct examination. Moreover, the trial court cautioned the jury not to consider an attorney's statement during closing as evidence. (Ex. F at 419-20.)

The Court need not determine whether counsel adequately argued a motion for judgment of acquittal or whether counsel should have requested a limiting instruction as to Ms. Pinckney's prior inconsistent statements, because Defendant cannot demonstrate prejudice. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689. The record shows that counsel moved for a judgment of acquittal and that the trial court denied the motion. (Ex. F at 377-78.) Even if counsel had advocated more strongly for a judgment of acquittal, there is no reasonable probability that the trial court would have granted the motion. See Hunter v. State, 8 So. 3d 1052, 1066 (Fla. 2008) ("A motion for judgment of acquittal should not be granted by the trial court unless there is no view of the evidence which the jury might take favorable to the opposite party that can be sustained under the law.") (internal citation and quotation marks omitted).

Likewise, even if counsel had requested the jury instruction, the Court finds there is no reasonable probability the outcome of the trial would have been different. The evidence presented by the State provided overwhelming evidence of Defendant's guilt, including the following: Officers stopped a car that matched the license plate number reported by two eye witnesses; the car was stopped a few miles away from the victim's house and only minutes after the 911 call was made; the victim's laptop computer was discovered in the car; after officers stopped Defendant's car he was identified by two eye witnesses as the man they saw leaving the

> victim's house; and Defendant's co-defendant testified against him at trial. As the State introduced sufficient evidence, the question of guilt was properly left to the jury and the Court finds a jury instruction would not have affected the outcome of the trial. Accordingly, Grounds Five and Six are summarily denied.

Resp. Ex. K at 71-74. The First DCA per curiam affirmed the trial court's denial without a written opinion. Resp. Ex. N. To the extent that the First DCA affirmed the trial court's denial on the merits, the Court will address these claims in accordance with the deferential standard for federal court review of state court adjudications.

In applying such deference, the Court finds that the state court adequately determined that Petitioner failed to demonstrate prejudice from trial counsel's alleged errors regarding his handling of Pinckney's prior inconsistent statements. At trial, Petitioner presented the testimony of co-defendant Pinckney who testified that it was her and Freeman who burglarized the home, while Petitioner stayed in the vehicle. Resp. Ex. E at 387. On direct examination, Pinckney acknowledged that this version was inconsistent with her pretrial statement that Petitioner was the one who entered the home and took the laptop. Id. at 391. She attempted to explain the discrepancy in her statements by testifying that she was under the influence when she gave the pretrial statement. Id. On rebuttal, the state presented testimony from Detective Thompson who confirmed what Pinckney has already testified to, and

explained that Pinckney appeared sober and coherent when she issued the pretrial statement. Id. at 412-17. As such, Petitioner was not prejudiced by Detective Thompson's alleged hearsay testimony because Pinckney's inconsistent pretrial declarations were already before the jury.

Further, even assuming that trial counsel should have objected or argued that evidence of this inconsistent pretrial statement did not demonstrate Petitioner's guilt, such exclusion would not have affected the other evidence supporting Petitioner's culpability. Notably, Petitioner's other co-defendant, Freeman, testified at trial that at the direction of Petitioner, she drove Petitioner and Pinckney to a residential neighborhood where Petitioner and Pinckney exited the car and walked toward a stranger's house. Id. at 205. Freeman stayed in the vehicle until Petitioner and Pinckney ran back to the car carrying a laptop and demanding that Freeman drive away. Id. at 205-06. A few minutes later, police pulled her over and she stopped the vehicle in a Walmart parking lot where she, Petitioner, and Pinckney were arrested. Id. at 207-09. She explained that Pinckney was not under the influence of drugs or alcohol on the day of the offense. Id. She stated that she was also facing burglary charges for her participation in the crime, and that Petitioner and his family threatened her not to cooperate with police or testify against him. Id. at 210.

Further, Mr. and Mrs. Goodell testified that they witnessed the crime and that one of the two individuals who went into the house was a male. Id. at 390-

91. Officer D.N. Logan testified that he pulled over a vehicle matching the description of the car given to the 911 dispatcher. Id. at 352-53. Officer Logan stated that there was a male in the front passenger seat of the vehicle at the time of contact and he identified that man as Petitioner. Id. at 355. The victim's laptop was also found in the vehicle. Id. at 367.

Considering the weight of the evidence contradicting Pinckney's trial testimony, Petitioner cannot demonstrate that but for trial counsel's alleged errors, the outcome of his trial would have been different. Thus, upon thorough review of the record and the applicable law, the Court concludes that the state court's decision to deny Petitioner's claims was neither contrary to nor an unreasonable application of Strickland, and it is not based on an unreasonable determination of the facts in light of the evidence presented to the state court. See 28 U.S.C. § 2254(d). Ground Two, Ground Three, and Ground Four are denied.

**C. Ground Five**

Petitioner argues that trial counsel was ineffective for failing to object to the state's improper closing statements. Doc. 1 at 12. He asserts that the trial court limited evidence of the Goodells' identification of Petitioner by only allowing them to testify that they recognized Petitioner to be one of the offenders because at the time of the identification, he had the same build, gender, and clothing. Id. However, according to Petitioner, during closing, the

state exceeded the scope of the trial court's limitation by arguing that the Goodells "were able to identify the other two people. The only male found in the car, Mr. Hightower and Miss Pinckney, the two that they saw coming from the victim's home." Id.

Petitioner raised this claim in his Rule 3.850 motion. Resp. Ex. K at 55-57. The trial court summarily denied the claim, finding in pertinent part:

> In Ground Ten,[] Defendant argues that counsel was ineffective for failing "to object to improper comment by the prosecutor that misled the jury and was also a violation of motion in limine." (Def.'s Supp. Mot. 2.) Specifically, Defendant states that during trial, "the court concluded that the witness Mr. Goodell, never identified the Defendant in court and ruled that the witness would be limited to only say that the clothing, build and gender were similar, that the man looked similar, but not a positive identification, nor a facial identification." (Def.'s Supp. Mot. 3.) Defendant contends that, despite the trial court's ruling, "during closing arguments, the State prosecutor informed the jury that the witnesses were able to identify the Defendant." Defendant reasons that if counsel had objected to the improper argument, then "this lack of identification . . . would have created strong doubt within the minds of the jury." (Def.'s Supp. Mot. 4.)
>
> During closing arguments, the State argued, "But [the Goodells] were able to identify the other two people. The only male found in the car, Mr. Hightower and Miss Pinckney, the two that they saw coming from the victim's home." (Ex. F at 436.) This argument was not improper. The trial court denied Defendant's motion to suppress and allowed the Goodells to testify about their out-of-court identifications. The trial court only limited Mr. Goodell's testimony so that he could not testify that he recognized Defendant's face, and

that he recognized Defendant by his build, gender, and clothing. It was up to the jury to determine whether these identifications were credible in light of the discrepancies between Mr. Goodell's description of Defendant to the 911 operator and Defendant's actual appearance and clothing. Moreover, the trial court cautioned the jury not to consider an attorney's statement during closing arguments as evidence. (Ex. F at 419-20.) Finally, even assuming the State's arguments were excluded, the Court finds that it would not have created strong reasonable doubt in the minds of the jurors. As discussed <u>infra</u> in Grounds Five and Six, there was overwhelming evidence of guilt in this case. Accordingly, counsel was not deficient for failing to object during the State's closing arguments, and Ground Ten is denied.

Resp. Ex. K at 78-79. The First DCA per curiam affirmed the trial court's denial without a written opinion. Resp. Ex. N. To the extent that the First DCA affirmed the trial court's denial on the merits, the Court will address the claim in accordance with the deferential standard for federal court review of state court adjudications.

Upon thorough review of the record and the applicable law, the Court concludes that the state court's decision to deny Petitioner's claim was neither contrary to nor an unreasonable application of <u>Strickland</u>, and it is not based on an unreasonable determination of the facts in light of the evidence presented to the state court.  <u>See</u> 28 U.S.C. § 2254(d). Ground Five is denied.

**D. Ground Six**

Petitioner asserts that trial counsel was ineffective for failing to introduce exculpatory evidence that revealed the shoeprint on the victim's door, where Petitioner allegedly kicked the door in, did not match the shoeprint impression that police took of Petitioner's shoe. Doc. 1 at 13; Doc. 2 at 25-29. Petitioner admits that this claim is unexhausted and procedurally barred. Doc. 2 at 27. However, he attempts to overcome this procedural default by relying on Martinez v. Ryan, 566 U.S. 1 (2012), and arguing that he can show "cause" to excuse his default because he did not have counsel when he filed his Rule 3.850 motion. Doc. 2 at 28.

Under Martinez, Petitioner must demonstrate more than the general assertion that the trial court did not appoint counsel in the initial-review collateral proceeding. 566 U.S. at 14. Petitioner must "also demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." Id. (citations omitted); see also Lambrix v. Sec'y Fla. Dept. of Corr., 851 F.3d 1158, 1164 (11th Cir. 2017). Conversely, his claim is "insubstantial" if "it does not have any merit or . . . is wholly without factual support." Id. at 16. For the reasons that follow, the Court finds that even if Petitioner demonstrates that his lack of postconviction counsel caused his procedural default, he cannot

demonstrate that his underlying ineffective-assistance-of-counsel claim is substantial in order to establish prejudice under <u>Martinez</u>.

In his Reply, Petitioner argues that he has demonstrated prejudice under <u>Martinez</u> because "the only evidence that could possibly have led the jury to convict [Petitioner] is the testimony of his codefendant [Freeman], which was rebutted by defense witness Pinckney." Doc. 18 at 9. He argues that "[h]ad trial counsel presented direct evidence, i.e., the footprint, that refuted and completely impeached the testimony of Freeman (the State's witness), there is zero probability that [Petitioner] would have been convicted." <u>Id.</u> This argument is flawed for multiple reasons. First, even if the shoe impression found on the door did not match Petitioner's shoe impression,[5] such evidence does not prove that Petitioner did not participate in the burglary. Rather, it merely contradicts the evidence that Petitioner was the individual who kicked the door during the course of the burglary. Second, this evidence does not refute the Goodells' eyewitness testimony that they saw a <u>man</u> and a woman walking up to the victim's door and break in. Nor does it refute the evidence that when Petitioner was apprehended, he was wearing the same clothing and had the same body type as that of the male who was seen breaking into the victim's home. Third,

---

[5] Respondents also argue that it is unclear if shoeprint evidence exists. <u>See</u> Resp. at 40-41. Petitioner does not offer an argument refuting Respondents' position, but merely claims that he is entitled to an evidentiary hearing to attempt to adduce the existence of such evidence. Doc. 18 at 8.

it does not refute the evidence that the victim's laptop was found in the car where Petitioner was a passenger. Fourth, Pinckney's trial testimony was severely impeached by her own prior inconsistent statements incriminating Petitioner. As such, because this claim is unsubstantial and lacks merit, Petitioner cannot rely on <u>Martinez</u> to excuse the procedural default of this claim. Likewise, Petitioner has failed to demonstrate that failure to consider this claim on the merits will result in a fundamental miscarriage of justice. Ground Six is denied.

Accordingly, it is

**ORDERED AND ADJUDGED:**

1.     The Petition (Doc. 1) is **DENIED** and this case is **DISMISSED WITH PREJUDICE**.

2.     The **Clerk of Court** shall enter judgment accordingly, terminate any pending motions, and close this case.

3.     If Petitioner appeals this Order, the Court denies a certificate of appealability.   Because the Court has determined that a certificate of appealability is not warranted, the **Clerk** shall terminate from the pending

motions report any motion to proceed on appeal as a pauper that may be filed in this case. Such termination shall serve as a denial of the motion.[6]

**DONE AND ORDERED** at Jacksonville, Florida, this 25th day of June, 2020.

*Timothy J. Corrigan*

TIMOTHY J. CORRIGAN
United States District Judge

Jax-7

C:   Nathan Napoleon Hightower, III
     Counsel of Record

---

[6] The Court should issue a certificate of appealability only if the Petitioner makes "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  To make this substantial showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further.'" Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)).  Here, after consideration of the record as a whole, the Court will deny a certificate of appealability.